In the Matter of the Judicial Settlement of the Account of Proceedings of GEORGE F. CANFIELD and THE FARMERS' LOAN AND TRUST COMPANY as Trustees under the Last Will and Testament of MARGARET T. SCHLEY, Deceased.

ANDREW F. HAMMERSLEY, as Special Guardian, Appellant; GEORGE F. CANFIELD and Others, Respondents.

First Department, July 14, 1922.

Wills — testamentary trust — res judicata — purchase of proportionate increase of stock with extraordinary cash dividends — sale of stock at profit — objection on intermediate accounting that dividend belonged to income but no claim made as to stock purchased therewith — decree that part of cash dividend belonged to income is res judicata of right of beneficiaries to part of profits from sale of stock — profits from sale not payable to life beneficiary where will did not provide for distribution of profits — said profits not to be considered in determining whether subsequent stock dividend should be charged to income or principal — extraordinary stock dividend charged to principal which would otherwise be depleted.

Where testamentary trustees received an extraordinary cash dividend and purchased therewith the proportionate share of stock to which they were entitled on an increase of the capital stock of the corporation, and subsequently sold the same at a profit, the life beneficiaries are estopped from claiming any portion of the profits realized on the sale of said stock, where it appears that on an intermediate accounting they did not make any claim to the stock but objected only to the charging of the extraordinary cash dividend to principal instead of income, and where the decree required the trustees to pay a portion

of that dividend to the life beneficiaries, for said decree is *res judicata* of the question.

Since the provisions of the will directing the creation of the trust did not require or direct the trustees to distribute profits, but only to apply and distribute the net rents, interest and income, the profits derived from the sale of said stock which was bought with money belonging to the principal are not to be charged to income but to principal.

Said profits realized from the sale of the stock are not to be taken into consideration in determining whether a subsequent extraordinary stock dividend of eighty-four per cent should be charged to income or to principal.

And since to charge the extraordinary stock dividend to income would operate to deplete the principal of the trust fund, it must be charged to principal under the rule that extraordinary dividends payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the fund and the life beneficiaries in such a way as to preserve the integrity of the trust fund.

SMITH, J., dissents in part, with opinion.

APPEAL by Andrew F. Hammersley, as special guardian, from parts of a decree of the Surrogate's Court of the county of New York, entered in said Surrogate's Court on the 29th day of March, 1922, judicially settling the intermediate account of the trustees of a trust created under the last will and testament of Margaret T. Schley, deceased.

*Andrew S. Hammersley,* special guardian in person [*Harry H. Hoffnagle* of counsel], for the appellant.

*Seibert & Riggs* [*R. E. T. Riggs* of counsel], for life beneficiaries, respondents.

*Satterlee, Canfield & Stone,* for the trustees, respondents.

DOWLING, J.:

Margaret T. Schley, the testatrix, died on March 1, 1911, leaving a last will and testament which was duly admitted to probate by the Surrogate's Court of New York county on March 21, 1911, and whereof George F. Canfield and the Farmers' Loan and Trust Company were executors and trustees and to whom letters testamentary were duly issued. She left an estate amounting to nearly $2,000,000.

The will of the testatrix contained the following provisions:

" *Sixth.* After the payment of my debts and funeral and testamentary expenses and providing for the foregoing legacies I give, devise and bequeath unto my executors and trustees hereinafter named, or to such of them as may qualify, and to the survivor of them, all the rest, residue and remainder of my property and estate, real and personal, and of every kind and nature whatsoever

and wheresoever situated, of which I may die seized and possessed, or may be entitled to at the time of my death, in trust, nevertheless, to and for the following uses and purposes:

"Upon the trust to take possession of all real and personal property; to invest all personal estate and the proceeds of the sale of any real estate; and to collect and receive all rents, interest and income from the real and personal estate and the proceeds of the sale of any real estate and, after paying thereout and therefrom any and all taxes, charges, expenses and other necessary disbursements, to apply the net rents, interest and income from my said residuary estate, during the life of my husband, Dr. James Montfort Schley, to the use of my said husband and my said children in the following proportions: one-third thereof to my said husband, Dr. James Montfort Schley; one-sixth thereof to my son, Henry Spaulding Schley; one-sixth thereof to my son, James Montfort Schley, Jr.; one-sixth thereof to my daughter, Katharine Beckwith Schley; and one-sixth thereof to my daughter, Marguerite Elfrida Schley."

Then follow provisions that if any of the children of testatrix should die before her or after her prior to the death of her husband, leaving lawful issue surviving, the share of the child so dying shall be paid to such issue, in default of which the share shall be divided among the surviving children and the issue of any deceased child. There is then a further trust created as to the residuary of her estate for the benefit of her surviving children and the issue of any deceased child.

"*Eighth.* I hereby nominate, constitute and appoint my friend, George F. Canfield, of New York City, and the Farmers' Loan & Trust Company, of the City of New York, Executors of and Trustees under this my last Will and Testament, and I hereby direct that they shall not receive double commissions for acting as executors and trustees.

"I hereby authorize and empower my executors and trustees to sell any and all of my estate, both real and personal, and wheresoever situated, at public or private sale, and at such time or times in their discretion as to them may seem best, and to let and lease any of my real estate for any length of time, and to make, execute and deliver any and all leases, deeds, conveyances and other instruments as may, from time to time, be necessary and proper in the premises.

"I also further authorize and empower my said executors and trustees to retain and hold any investments and real estate which may be a part of my estate at the time of my death for as long a time as shall seem expedient and proper to them, and to change

investments, and to invest and reinvest any of the funds of my estate which may at any time come into their hands in the following securities which are in addition to those authorized by law, namely: bonds of any State or Municipality of the United States, which for the last ten years prior to the time when the investment shall be made shall have yielded at least three per cent income upon money invested therein; bonds and preferred stocks of any railroad corporation doing business in the United States, Canada or England, provided the said corporation has paid four per cent dividends on its common stock for at least five years continuously before the investments shall be made; and generally to invest in such securities and real estate as to my said executors and trustees, in the exercise of their own unlimited discretion, uncontrolled by any law or court, may seem best.

" I hereby direct that my executors and trustees, in case they invest any part of my estate in securities at a premium above the par value thereof, shall not be required to provide out of the annual income received each year from said securities a sinking fund to cover any loss arising from the difference between the purchase price and the amount at which said securities are redeemable or are redeemed."

Included in the property left by testatrix were 675 shares of the capital stock of the Central Trust Company of New York, which were retained by the trustees as a partial investment of the trust created by the will, and at the time the trust was set up these shares were received at a value of $1,030 per share, or a total of $695,250, at which value they have ever since been carried upon the books of the trustees. Their actual book value, however, on March 1, 1911, when testatrix died, was $436,473.43.

On May 16, 1916, the Central Trust Company declared an extraordinary cash dividend of $66⅔ per share to the stockholders of record on June 1, 1916, payable on July 1, 1916, and on the same day the trustees of said company authorized an increase of its capital stock from $3,000,000 to $5,000,000, and gave to the stockholders of record an opportunity to subscribe for the increased stock at par in proportion to their holdings.

On May 16, 1916, the financial condition of the company was as follows:

| | |
|---|---|
| Capital stock ............................. | $3,000,000 00 |
| Surplus ................................... | 15,000,000 00 |
| Undivided profits ......................... | 2,596,916 04 |
| | $20,596,916 04 |

At the close of business on June 30, 1916, its financial condition was:

Capital stock ............................... $3,000,000 00
Surplus ..................................... 15,000,000 00
Undivided profits ........................... 3,258,793 74

$21,258,793 74

At the close of business on July 3, 1916, after the cash dividend of $66⅔ per share had been paid and the capital stock increased, its financial condition was:

Capital stock................................ $5,000,000 00
Surplus ..................................... 15,000,000 00
Undivided profits ........................... 1,258,793 74

$21,258,793 74

On July 1, 1916, the trustees herein received the extraordinary cash dividend amounting to $45,000 (charging that amount on the books of the trust estate to principal), and on July 3, 1916, they exercised their right to subscribe to the additional stock issue and purchased 450 additional shares, paying $45,000 therefor (which they also entered on their books as an investment of the principal of the trust fund).

On September 30, 1916, the trustees duly filed their intermediate account setting forth the above facts, including not only the receipt of the $45,000 dividend but the purchase of the additional 450 shares of stock, and at the same time reported to the Surrogate's Court that the $45,000 cash dividend above mentioned had been received by them and charged to the principal account of the trust. Thereupon objections were interposed by the life beneficiaries, insisting that the trustees were not warranted in charging the $45,000 cash dividend so received to principal and asserting that said $45,000 was income and belonged to the life tenants.

Surrogate FOWLER considered the objections and determined that of the $45,000 cash so received the sum of $26,957.14 was income and the balance, $18,042.86, was principal, and directed that the account as filed be amended in accordance with his directions. Said account was thereafter duly so amended, and a decree judicially settling said account as amended was duly signed and entered on the 6th day of February, 1917.

The relevant part of said decree in question reads as follows:
" It is hereby Ordered, Adjudged and Decreed that the said

account so filed by the said Trustees be and it is hereby amended as follows: * * *

" That $26,957.14 out of the item of cash of $45,000 received from the Central Trust Company in extra cash dividend contained in the Principal Account of the Trustees, is income, and that the balance, to wit, $18,042.86, is principal and that the said shares of stock and said cash so adjudged to be income belongs to the life tenants of said trust in the proportions to which they are entitled to the income of said trust as specified in the will of said decedent."

The words " said shares of stock " contained in the sentence last quoted refer to a preceding determination that 1,050.32 shares of stock (out of 3,500) of the Continental Insurance Company were income.

The computation of the relative proportions of the $45,000 to be credited to principal and income was made on the rule deemed to have been laid down in *Matter of Osborne* (209 N. Y. 450), and was based on the fact that while the book value of the 675 shares of stock at the death of testatrix was $646.6271 per share, or a total of $436,473.43, the value of the same shares after the payment of the extraordinary dividend was $618.8972 per share, or a total of $418,430.61, leaving a depreciation of $18,042.86, and impairing the principal of the trust fund to this extent, and it was this amount which was adjudged by the surrogate to belong to principal.

No appeal was taken from this decree, and the amount adjudged thereby to belong to income ($26,957.18) was thereafter paid to the life beneficiaries in the respective proportions to which they were entitled, and there is no proof that any of them objected to receiving the payment, or refused to accept same.

On January 9, 1917, the trustees sold the 450 shares of stock thus acquired by them for the sum of $360,000, making a profit of $315,000. This transaction was not included in their intermediate account as settled by the decree of February 6, 1917. Upon this present accounting they have credited the amount of $315,000 to principal.

On April 16, 1918, the financial condition of the Central Trust Company was as follows:

| | |
|---|---:|
| Capital stock | $5,000,000 00 |
| Surplus | 15,000,000 00 |
| Undivided profits | 807,535 93 |
| | $20,807,535 93 |

On April 16, 1918, preparatory to a merger with the Union Trust Company, the Central Trust Company declared an extraordinary stock dividend of eighty-four per cent which became payable May 8, 1918, to the then stockholders of record. As such dividend the trustees received 567 additional shares of Central Trust Company stock, being eighty-four per cent of the 675 original shares still held by them. These shares have also been credited to principal by the trustees on this accounting.

On June 18, 1918, the merger between the Central Trust Company and the Union Trust Company became effective. The company created by this merger was known as the Central Union Trust Company, and its financial condition on that date was as follows:

| | |
|---|---:|
| Capital stock (consisting of 125,000 shares at $100 per share) ............................... | $12,500,000 00 |
| Surplus ...................................... | 15,000,000 00 |
| Undivided profits .......................... | 2,003,160 86 |

On this date each share of the trust company had a value of $236.02, giving to the 675 original shares of stock held by this estate a value of $159,313.50, showing a diminution in the book value as of the date that the trust was set up of $277,159.93.

In the accounting the trustees holding in trust an estate of over $1,800,000, have credited to principal the following:

| | |
|---|---:|
| 1. The original 675 shares of Central Trust Company stock, having a book value on June 18, 1918, at $236.02 per share......................... | $159,313 50 |
| 2. Proportion of $45,000 dividend retained as principal by decree of February 6, 1917............ | 18,042 86 |
| 3. Profit derived from sale of 450 shares of Central Trust Company stock in January, 1917, purchased through the right to subscribe given to stockholders in July, 1916................... | 315,000 00 |
| 4. 567 shares of Central Trust Company stock received as a stock dividend June, 1918, at a book value of $236.02 per share.............. | 133,823 34 |
| Total .............................. | $626,179 70 |

As has been said, the book value of the original 675 shares owned by the decedent on the date of her death at $646.62 per share was $436,473.43.

Objections to this accounting were filed by the life benefic-

iaries upon two grounds: (1) That the 567 shares of Central Trust Company stock were income and not principal; and (2) that the life beneficiaries were entitled to the proportion of the profit of $315,000 realized on the sale as aforesaid to the extent that income was used in the purchase of the 450 shares, at least 2,695,714 /4,500,000 of $315,000.

The account and the objections were sent to a referee. There being practically no dispute as to the facts, the proof before the referee was taken in the form of affidavits.

The learned referee upheld the first objection of the life beneficiaries and decided that the 567 shares received by way of dividend on June 16, 1918, were income and not principal. Applying the rule laid down in *Matter of Osborne* (209 N. Y. 450), that all extraordinary dividends, whether cash or stock, belong to the life beneficiary, unless they entrench, in whole or in part, upon the capital of the trust fund as received from the testatrix, he held in his opinion that the delivery of the 567 shares so received would not entrench either in whole or in part upon the capital of the trust fund as received by the testatrix by reason of the increases of cash in that capital received by the trust fund out of the incident of the ownership of the 675 shares.

But he overruled the second objection of the life beneficiaries upon the ground that the decree of February 6, 1917, was *res adjudicata* upon the point that the 450 shares of stock purchased by the trustees in July, 1916, were principal, and that· the profits made from the investment of principal are also principal. He states in so doing that were it not for the decree the case of *Matter of Harteau* (204 N. Y. 292), relied upon by them, might well apply.

Thereafter the special guardian for the infant remaindermen was allowed to file objections, under which he claimed that the profit made on the 450 shares was not $315,000, but that in determining the amount of profit the trustees should have averaged the price of all the shares of the company held by them. These objections were overruled by the referee. The life beneficiaries thereupon moved to confirm the report of the referee, which motion was granted.

The present appeal is taken by the special guardian, who represents infant remaindermen. The respondents are the life beneficiaries. The trustees appear but take no position with either party upon the appeal. The questions raised by the appellant are as follows:

1. Is the direction of the testatrix " to apply the net rents, interest and income " to be construed as a valid direction to the trustees to award to the life beneficiaries as income the 567 shares

of Central Trust Company stock (later exchanged for Central Union Trust Company stock) received by the trustees on May 10, 1918, as an eighty-four per cent stock dividend on 675 shares?

2. Should the profit derived by the trustees from the sale of 450 shares of Central Trust Company stock on January 9, 1917, be applied as an offset against the impairment in the corpus of the trust fund caused by the declaration and payment of the eighty-four per cent stock dividend by the Central Trust Company in 1918?

3. If the profit derived by the trustees from the sale of 450 shares of the Central Trust Company stock on January 9, 1917, should be applied as an offset against the impairment in the corpus of the trust fund caused by the declaration and payment of the eighty-four per cent stock dividend by the Central Trust Company in 1918, should such profit be computed at $315,000, as claimed by the life beneficiaries and the trustees, or at $63,900, as claimed by the special guardian?

At the outset we are met with a state of facts which limits us in the questions to be determined. It is not open now to the life beneficiaries to claim that any part of the 450 shares of stock bought by the trustees belongs, or belonged, to income. When the trustees filed their intermediate accounting in 1916, they set forth not only the receipt of the $45,000 as a dividend which they had credited to principal, but they also set forth the purchase by them with $45,000 of 450 shares of stock in the company at par, which shares they also credited to principal. The life beneficiaries sought only to obtain all, or some part, of the cash dividend, and made no objection to the purchase of the stock as an investment for principal, or to its inclusion as a part of the principal of the trust fund. That was the time for them to act, if they claimed any interest in the stock so bought, as they did in fact claim in regard to the stock dividend declared by the Continental Insurance Company. It is too late for them now to raise any contention as to what effect the law laid down in *Matter of Harteau* (204 N. Y. 292) might have had. While the learned counsel who at the present time represents respondents urges that an apportionment of the $315,000 profits made on the resale of the 450 shares of stock should be made, that cannot now be done. The matter is *res adjudicata* under the decree of February 6, 1917, and for all purposes the 450 shares of stock must be treated as a part of the principal of the trust fund, and the profits made from their sale must also be regarded as a part of such principal. The life beneficiaries stood upon their right to receive all or a part of the $45,000 cash dividend

12

as income. They won their point and received without question as their share the sum of $26,957.14 thereof. They made no claim to any share in the 450 shares of stock which the trustees showed they had bought for principal. They may have had good reason for their failure to demand any share of the stock then, instead of a share of the cash. But they made their choice and are bound by it, and the decree is a bar to their attempt to make such a claim now. To so do would enable them, as the referee put it, to eat their cake and still have it.

But treating the 450 shares as principal and the profit made upon their sale as principal also, can that profit be made a factor in determining whether the latest dividend of 567 shares of stock should be credited to income or principal and whether the payment of such dividend to the life beneficiaries will deplete the principal of the trust fund so as to reduce it below its original amount?

In his two opinions herein the learned referee held that the judicial settlement of the intermediate accounting of 1916 was *res adjudicata* and settled the status of the 450 shares and the profits made therein as additional principal of the trust fund, as it was indisputable that profit derived from the sale of principal investments belonged as an increment of principal. (Citing *Matter of Kernochan,* 104 N. Y. 618; *Stewart* v. *Phelps,* 71 App. Div. 91.) But he nevertheless held that the 567 shares in question were income, and belonged to the life tenants, because of his application of the decision in *Matter of Osborne* (209 N. Y. 450). In particular, he relied upon the following extracts from the opinion of Judge CHASE (p. 472): " The division was computed upon that basis, as incontestably appears from the fact that the amount of the trust fund at the creation of the trust was in fact preserved. * * * The judgment of this court was based upon the necessity of preserving the trust fund as it existed at the creation of the trust, including accumulated earnings of the corporation prior to that date. It was not based upon the alleged right in the life estateman to all dividends so long as they did not entrench upon the capital of the corporation."

And from page 473: " It will be seen that the earlier and also the latest decisions in this State clearly recognize and assert that where extraordinary dividends entrench upon the capital of the trust fund, they should be returned to such trust fund so far as necessary to preserve the same. * * * It is not alone the capital of the corporation that should be preserved, but the capital of the trust fund, whether invested by the trustees in stocks of corporations at a premium, or acquired from the testator or maker of the trust."

And from page 477: " The distinction between ordinary and extraordinary dividends is necessary to make a workable rule and at the same time preserve the integrity of the trust fund. The integrity of the trust fund and rights of the life beneficiary under the trust should each be considered, determined and preserved by a court of equity. * * * Extraordinary dividends, payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund."

This led the learned referee to the conclusion that, inasmuch as the effect of crediting the $315,000 to principal would be to raise it to a total in excess of the original amount of the trust fund, thus enlarging that fund, which the law does not favor, the 567 shares should go to income, under the ruling in the *Osborne* case that extraordinary dividends, whether payable in cash or stock, belong to the life beneficiary.

But in this conclusion, it seems to me, sufficient stress is not laid upon the fact that the 450 shares of stock which provided this profit were bought with money belonging to the principal of the fund and must be held to be principal, under the facts of this case, and that the profit realized from their sale must also be deemed to be principal. That profit did not represent any participation in the profits or assets of the trust company. It represented the eagerness of some third party to acquire the stock, either to aid in securing control, for investment or for speculative purposes. It was strictly and solely a profit made for principal from the sale of securities belonging to principal, and as such profits are not given to the life beneficiaries by the terms of the will, they must necessarily remain in the trust fund. For the paragraph (sixth) creating the trust provides that the trustees shall invest all personal estate and the proceeds of the sale of any real estate, shall collect and receive all rents, interest and income from the real and personal estate, and the proceeds of the sale of any real estate, and after paying therefrom all taxes, charges, expenses and necessary disbursements, shall apply *the net rents, interest and income* to the persons therein named. The word *profits* nowhere appears in this paragraph, and the will is drawn with such care as to preclude any belief that the omission of that word was not deliberate.

In *Baker* v. *Thompson* (181 App. Div. 469; affd., 224 N. Y. 592)

it was said: "It has uniformly been held in this State that new shares of stock purchased by trustees in the exercise of subscription rights given to the stockholders, and the proceeds of the sale of such subscription rights are capital of the trust estate to which the life beneficiary is not entitled."

In *United States Trust Co.* v. *Heye* (224 N. Y. 242) Judge CRANE said (pp. 252, 253): "The idea prevailing with these claimants seems to have been that the value of the principal at the time of the creation of the trust determines the rights of the life beneficiaries and the remaindermen; that so long as the principal is in no way depleted or lessened, all the subsequent increase in value must be categoried as income, whether distributed as such or not. *Matter of Osborne* (209 N. Y. 450, 477) is given as authority for this proposition, but that case went no further than to hold that the principal of a trust fund invested in corporate stock should not be impaired by the division of accumulated surplus among life beneficiaries. 'Extraordinary dividends,' it was there said, 'payable from the accumulated earnings of the company, whether payable in cash or stock, belong to the life beneficiary, unless they entrench in whole or in part upon the capital of the trust fund as received from the testator or maker of the trust or invested in the stock, in which case such extraordinary dividends should be returned to the trust fund or apportioned between the trust fund and the life beneficiary in such a way as to preserve the integrity of the trust fund.' This does not mean that the principal of the trust fund has to remain at the same value, and that all increase belongs to the life beneficiaries. While the corpus of the fund may not be depleted, yet the corpus may accumulate or increase, and until there is some division in the nature of a dividend payable out of accumulated earnings or profits, there is nothing that can be awarded as income to beneficiaries."

The present question concerns solely a profit made on an outside transaction by which a profit was realized upon a sale of stock forming a part of the principal of the fund, and I think, therefore, while such profit is a part also of the principal of the fund and increases its amount beyond the original total, that as such increase is due solely to profits upon the stock made by sale and not to anything in the nature of a dividend declared or paid by the trust company, the amount of the profit realized upon such sale is not to be considered as an element in determining whether the 567 shares shall go as income to the life beneficiaries.

Excluding the $315,000 from consideration, and including the dividend of 567 shares as principal, the statement of the condition of the fund as of June 18, 1918 (the date of the merger), which

is the nearest date to the declaration of the stock dividends (April 16, 1918, payable May 8, 1918) of which there is proof, would be as follows:

1. Original 675 shares of Central Trust Company stock, having a book value on June 18, 1918, of $236.02 per share........................  $159,313 50
2. Proportion of cash dividend retained as principal by decree of February 6, 1917................  18,042 86
3. Dividend of 567 shares of Central Trust Company stock, having a book value on June 18, 1918, of $236.02 per share.....................  133,823 34

                                                                 .  $311,179 70

This shows a deficit of about $125,000 from the original total of the trust fund, which was $436,473.43.

It follows, therefore, that the decree in so far as it is appealed from should be reversed and the 567 shares of stock in question be adjudged to belong to the principal of the trust fund. The matter will be remitted to the Surrogate's Court for suitable action in conformity to this opinion. Costs and disbursements are allowed to the various parties who have appeared on this appeal, payable out of the trust fund, with an allowance to the special guardian, also payable therefrom.

CLARKE, P. J., PAGE and GREENBAUM, JJ., concur; SMITH, J., dissents in part.

SMITH, J. (dissenting in part):

I concur with the opinion of Mr. Justice DOWLING except where he refers to maintaining the original book value of the 675 shares. That original book value was $646.62 per share. When the stock was increased July 3, 1916, by 450 shares on the payment of only $100 per share, the book value of the 675 shares was reduced to $425.1758 per share and the 450 shares were added to the principal to make up that reduction, so that thereafter for a time the stock holding consisted of 1,125 shares at a book value of $425.1758 per share. This maintained the original book value of the total holding of shares consisting of the 675 shares of the book value of $286,993.66 and 450 shares of the book value of $191,329.11. When the 450 shares were sold whatever the profit was on that sale not attributable to earnings belonged to the principal as has been properly held. The original book value of the 675 shares having been made good by the addition to principal of the 450 shares, it is not right to hold that the original book value of the

675 shares should again be made good. When the stock dividend of 567 shares was declared, the book value of the 675 shares was not reduced from $646.62 per share to $236.02, but from $425.1758 per share to $236.02.

In order, therefore, properly to state what should be done with the 567 shares stock dividend, we must take the book value of 675 shares before the stock dividend, and the book value of the combined 675 shares and 567 shares, or 1,242 shares, after the stock dividend: 675 shares before stock dividend, viz., on July 3, 1916, at $425.1758, equal $286,993.66; 1,242 shares at $236.02, after stock dividend on June 18, 1916, equal $293,136.84; showing that the stock after the dividend had a book value of $6,143.18 in excess of the book value of the 675 shares before. This was caused by earnings which had not been distributed; but on July 1, 1918, two weeks later, there was distributed in dividends the sum of $6,831. So that the life beneficiaries duly received the above excess, and the whole 567 shares should be apportioned to principal. *But* there should be no deficit found, as the value of the trust fund, in so far as originally represented by the 675 shares, has been fully maintained. The loss on the 675 shares occasioned by the 450 share transaction having been made good, we are thereafter only interested in the new book value of the 675 shares as above. The principal of the trust fund is maintained by the 450 shares and, when they were sold, by the proceeds of the sale. We are thereafter no longer affected by the original book value of the 675 shares.

The error is more apparent when we consider the result of holding that the original book value must be maintained. That result is an apparent deficit in the trust fund of " about $125,000," as set out in Mr. Justice DOWLING's opinion (at p. 181), and this " apparent deficit " would be increased if the $18,042.86 were eliminated. That sum had already been used to adjust the trust fund and cannot serve that purpose again. How can any such " apparent deficit " be made good? The life beneficiaries have not caused such a deficit. They have not received anything they should not receive.

The cause of the mistaken result above mentioned, as I view it, is the position taken that the book value of the shares of stock must be maintained at the original figure when all that is required is that the trust fund itself should be maintained. The trust fund has been fully maintained and more while the elements that go to make up that trust fund have been changed.

Decree so far as appealed from reversed and matter remitted to the Surrogate's Court for further action in accordance with opinion. Settle order on notice.